# SUPREME COURT.

## CHARLES BENEDICT and WIFE agt. WILLIAM N. SEYMOUR and others.

Formerly, in actions for partition, the ordinary practice, when a release could not be obtained from the wife, was, to pay the money, set apart for her dower, into court. But by the acts of 1848–9, such persons were, in effect, declared, in respect of property and its management, to stand precisely upon the same footing as "single females," and with the same power of disposal "as if they were unmarried."

*It seems,* therefore, that money, awarded to the wife on partition, need not be .paid into court.

Money paid to a married woman is not, as formerly, her husband's property, nor subject to her husband's disposal, "nor liable for his debts." His legal con-- trol over it is gone. And it may be considered doubtful, in such cases, whether the court can interfere on the question of undue influence by the husband.

It would seem to be the duty of the judiciary to reverse the former common-law presumption, and to assume (unless the contrary be expressly proved) that every married woman, of full age, is as " competent to manage and control" as any man or "single female."

*It seems* that the act of 1848, while it left to the married woman her common-law right of dower in her husband's property, took from the husband, intentionally or otherwise, his common-law *right of curtesy* in that of his wife.

So far as this act operates on existing marriages and existing property, it impairs the obligation of contracts, and is, on that ground, unconstitutional and void. It is valid, however, as to subsequent marriages, and as to subsequently acquired property under prior marriages. Hence the necessity, in all cases involving the claim of tenancy by the curtesy, of stating the *dates* when the marriage took place, and when the property sought to be partitioned was acquired.

The *value* of an inchoate tenancy by the curtesy, depends not only upon the principles applicable to life annuities and survivorships, but upon the *fact of issue*, and if none, upon the *likelihood* of issue.

*New-York Special Term*, 1854.

MOTION for partition and sale.

The facts will sufficiently appear in the opinion of the court.

—— —— *for plaintiff.*
—— —— *for defendant.*

ROOSEVELT, Justice. This case presents several difficulties, arising mainly out of the altered state of the law in relation to husband and wife. And as a sale ·is asked for, instead of an actual partition of the undivided interests of the parties, and as the rights of infants as well as of married women are to be affected, the questions which suggest themselves to the mind of the court demand the more careful consideration.

The counsel for the plaintiffs seems to take it for granted, in the draft decree which he has submitted for approval, that married women are still subject to their ancient disabilities, and married men entitled to their ancient prerogatives. In both aspects this assumption is erroneous.

By the act of April 28th, 1840, for the better securing of the·

interests of married women, in lands sold under decrees in partition, it was provided, that unless they chose to execute releases to their husbands, their inchoate right of dower, in such cases, should be valued, and a corresponding portion of the proceeds invested or paid over, as the court should deem best, to secure and protect the rights and interests of the parties. Under this act the ordinary practice, formerly, when a release could not be obtained from the wife, was to pay the money set apart for her dower into court.

By the acts of 1848-9, however, for the better protection of the rights of married women, such persons were, in effect, declared, in respect of property and its management, to stand precisely upon the same footing as " single females," and with the same power of disposal " as if they were unmarried." Why, then, should money awarded to them be any longer paid into court? Why, in other words, should the chamberlain of the city, without their request, be made their trustee?

Money paid to a married woman is not, as formerly, her husband's property, nor subject to her husband's " disposal," nor " liable for his debts." His legal control over it is gone. And as to undue *influence*, no woman of the present day is presumed so deficient in strength of mind, as to need protection against the persuasive potency of any husband. The law regards her capacity to resist as in no wise impaired by her promise to obey, and assumes that she can say, no, quite as freely, and quite as energetically, after marriage, as while she was only " a single female." True, the amending act of 1849 indicates, on this point, some slight misgiving, and provides that where an express trust has been created for a married woman, it shall not be discharged, even " on her written request," unless a justice of the supreme court, after due examination and inquiry, shall accompany such request with his " certificate," to the effect—for such I am inclined to think, although not very clearly expressed, was the intention of the act—that he is satisfied with " the capacity" of the lady " to manage and control." But even this qualification, confined, as it is, to particular trusts, and bearing on the present case only as a source of analogy, is,

in a great degree, neutralized by the spirit of a subsequent statute, passed on the 30th of June, 1851, which gives to all married women, who are stockholders or members of any corporation, the absolute right " to vote at any election for directors or trustees,"—and this without consulting either their husbands, or a justice of this or any other court.

After these strong and unequivocal legislative indications, it would seem to be the duty of the judiciary to reverse the former common-law presumption, and to assume (unless the contrary be expressly proved) that every married woman, of full age, is as " competent to manage and control " as any man or " single female."

Next, as to what has been called the curtesy estate of the husband. By the common law, every husband, in right of his wife, immediately on the marriage, except where a settlement was agreed upon, became seized of his wife's houses and lands, during their joint lives, and (if issue followed) during his own life.

The act of 1848, while it left to the married woman her common-law right of dower in her husband's property, it would seem, took from the husband, intentionally or otherwise, his common-law right of curtesy in that of his wife. As marriage, whatever may be its other attributes, is, in law, a civil contract, it is obvious that this act of the legislature, so far as it operates on existing marriages and existing property, impairs the obligation of contracts, and is, on that ground, unconstitutional and void. (*White* agt. *White*, 5 *Barb*. 474.) As to subsequent marriages, however, and as to subsequently acquired property under prior marriages, its validity, I presume, whatever may be said of its justice, cannot be disputed. Hence the necessity, in all cases involving the claim of tenancy by the curtesy, of stating the dates when the union between the parties was formed, and when the property sought to be partitioned was acquired. Without these elements, it is impossible for the court to determine—as they are called upon to do—the rights of the parties. And even when these elements are supplied, if they show a constitutional right in the husband beyond the

Benedict and wife agt. Seymour and others.

reach of the legislature, its duration, and of course its value, still depends on the further circumstance, generally overlooked, of issue born. With issue, the estate is for the husband's own life; without issue, it cannot extend beyond his wife's. Its value, therefore, depends not only upon the principles applicable to life annuities and survivorships, but upon the *fact* of issue; and if none, upon the *likelihood* of issue. In this respect it differs materially from the inchoate dower of the wife. The widower, after his wife's death, takes only on the condition of paternity—the widow, after her husband's, whether she has been a mother or not.

The greater or less likelihood of issue, in any given case, must depend again, it is obvious, not only upon the principles applicable to life and survivorship, but upon facts and circumstances not usually taken into consideration by the law. One extreme case it is true, has been admitted, and that only under the system now abolished, of entailment. An estate-tail, "after possibility of issue extinct," was a recognized head of the ancient jurisprudence. Short of impossibility, there was no case that I am aware of. How, then, in other cases, is an inchoate tenancy by the curtesy to be valued? In other words, what sum, in gross, as a substitute for the probable prospective income, is to be allowed?

On this, and other points suggested, I wish to hear the counsel for the parties before adopting the draft decrees which have been submitted in this and some other cases.

Judgment suspended accordingly.